IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.                                                   CIVIL ACTION NO.
                                                     1:17-CR-421-SCJ-LTW

JOSEPH ORLANDO HOOD,

      Defendant.

## MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION AND ORDER CERTIFYING CASE READY FOR TRIAL

This case is presently before the Court on Defendant Joseph Orlando Hood's ("Defendant") Motion to Suppress Evidence (Doc. 16), Motion to Suppress In-Court Identification (Doc. 18), and Perfected Motion to Suppress Evidence. (Doc. 23). The Court held an evidentiary hearing on the aforementioned motions on April 17, 2018. (Doc. 43). Defendant submitted a post-hearing brief in support of his motions. (Doc. 44). The Government filed a response brief (Doc. 46), to which Defendant replied. (Doc. 47). Having considered Defendant's motions, testimony presented at the evidentiary hearing, the parties' briefs, and all supporting documents submitted, and for the reasons set forth below, this Court **RECOMMENDS** that Defendant's motions be **DENIED**. (Docs. 16, 18, 23).

AO 72A
(Rev.8/82)

## BACKGROUND

## I.   PROCEDURAL HISTORY

On November 28, 2017, the Grand Jury returned a nine-count indictment against Defendant. (Doc. 2). Defendant is charged with four counts of Hobbs Act robberies in violation of 18 U.S.C. § 1951(a); possession, carrying, and using firearms during and in relation to those robberies in violation of 18 U.S.C. § 924(c)(1)(A); and possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1). (Doc. 2). On December 6, 2017, Defendant was arraigned and pleaded not guilty to the charges in the indictment. (Doc. 8). Defendant filed five pretrial motions on January 18, 2018, including a Motion to Suppress Evidence and Statements and a Motion to Suppress In-Court Identification, seeking to suppress items found in the apartment where officers encountered Defendant, items found in a car searched at one of the scenes, and witness identifications. (Docs. 16, 18). Defendant then filed a Perfected Motion to Suppress on February 15, 2018, asserting his standing to challenge the evidence seized from the car and the apartment. (Doc. 23). The Government responded that Defendant had no reasonable expectation of privacy in a stolen car or his friend's apartment, and therefore, no standing to challenge the evidence found therein. (Doc. 24). The Court held an evidentiary hearing on April 17, 2018, and heard testimony about the collection of evidence in the apartment and the witness identifications. (Doc. 43). On June 29, Defendant filed a Post-Hearing Brief in Support of Motion to Suppress Evidence and Statements. (Doc. 44). The Government filed a Response in opposition (Doc. 46), and

2

the Defendant filed a Reply.  (Doc. 47).

## II.   **FACTUAL BACKGROUND**

At approximately 1:40 a.m. on the morning of November 17, 2016, DeKalb County dispatchers received a 911 call reporting that a person had been shot and requesting assistance at 3097 Cedar Creek Drive.[1]  (Tr. 7; Gov't Ex. 4, at 5).  Sergeant Jeffrey Harris[2] responded to the call.  (Tr. 7).  While en route to the location, Sergeant Harris heard a report on his radio about an armed robbery nearby at Raymok Bar and Grill ("Raymok Bar").  (Tr. 34-35, 39).

When Sergeant Harris arrived at the scene around 1:52 a.m., an older gentleman who lived in the apartment[3] answered the door, and another resident of the apartment was also present.  (Tr. 11).  About two feet inside the door, Defendant was lying face down on the ground bleeding from a gunshot wound in his lower left leg.  (Tr. 10; Gov't Ex. 3).  Observing that Defendant was in distress, Sergeant Harris called to have EMS come immediately.  (Tr. 12).  Sergeant Harris then tried to talk to Defendant, who identified himself as Joshua Dallas and said he was shot while walking past the Citgo.

---

[1] The location was referred to as 3097 Cedar Creek Drive throughout the evidentiary hearing, (Tr. 7, 21, 23, 34, 35, 52), but is written as 3097 Cedar Brook Drive on the CAD report.  (Gov't Ex. 4, at 5).

[2] In 2016, at the time of incident at issue in this case, Sergeant Harris held the rank of Master Police Officer with DeKalb County.  (Tr. 7).

[3] The resident of the apartment is alleged to be a family friend who defendant has known for at least eighteen years and refers to as "Uncle Terry."  (Def.'s Perf. Mot. 5-6, Doc. 23).

3

(Tr. 12).   At this point, Sergeant Harris claims that he perceived Defendant to be a victim.   (Tr. 13).

Sergeant Harris then tried to speak with the two other men in the apartment, but Defendant kept interrupting them.   (Tr. 14).   Sergeant Harris asked the other men if Defendant lived in the apartment, but Defendant screamed over them when they attempted to answer.   (Tr. 45).   Defendant's behavior caused Sergeant Harris to become suspicious.   (Tr. 15).   Before EMS arrived at the scene,[4] Sergeant Harris received reports that the Raymok Bar suspect was a 20- to 25-year-old black male wearing a long-sleeve gray sweater and jeans.   (Tr. 34-35, 40; Gov't Ex. 4, at 1).   After observing Defendant's behavior and receiving the report, Sergeant Harris began to suspect that Defendant was involved in the Raymok Bar robbery.   (Tr. 16).

Sergeant Harris took pictures to preserve the scene for detectives before EMS arrived and disturbed it.   (Tr. 13,  Gov't Exs. 3 and 4).   Defendant was shirtless and shoeless, but a gray top[5] and sneakers were lying next to him.   (Tr. 41; Gov't Ex. 3). Sergeant Harris collected the gray top and sneakers and put them in a paper bag.   (Tr. 18, 31-32).   Sergeant Harris also collected the pants that EMS cut off Defendant while

---

[4] Sergeant Harris testified that he did not receive a description of the Raymok Bar robbery suspect until after questioning Defendant, but before EMS arrived.   (Tr. 15-16, 33).   The incident report Sergeant Harris completed later that day and the CAD report suggest an earlier report going out before Sergeant Harris arrived at the apartment that the Raymok Bar robbery suspect was a black man wearing a gray hooded jacket and jeans.   (Tr. 34-35; Gov't Ex. 4, at 1).

[5] This garment of clothing is also referred to as a "coat," "hoodie," and "shirt" during the evidentiary hearing.   (E.g. Tr. 41, 32).

4

treating his wound. (Tr. 32). At this point, Sergeant Harris believed Defendant could be either a victim or involved in the Raymok Bar robbery, and explained that he would have preserved the evidence under either scenario. (Tr. 18, 43).

EMS transported Defendant to Atlanta Medical Center, and Sergeant Harris followed in his patrol car. (Tr. 35). During the hearing, Sergeant Harris agreed that Defendant was in his custody from the time Sergeant Harris arrived at the apartment until either Detective Centron or Officer Wynn arrived at Atlanta Medical Center. (Tr. 35-37). The CAD report[6] states that Defendant was taken into custody and put in leg shackles around 12:50 p.m. on September 17, 2016. (Gov't Ex. 4, at 7-8). On the same day, K-9s were called to conduct an article search. (Tr. 51). The K-9s located two guns, a knit cap, and a bloody glove outside the apartment complex where Sergeant Harris encountered Defendant. (Tr. 51-52). The police responding to the 911 call from Raymok Bar found car keys in the parking lot that opened an unclaimed Acura. (Def.'s Perf. Mot. 9, Doc. 23). The officers ran the VIN number and discovered the car had been stolen. (Gov't Resp. 5, Doc 24). After impounding the car, the officers searched it and found bullets, a cell phone, and a number of identification documents belonging to Defendant. (Id.).

Four days later, on November 21, 2016, Detective Doronte Evans presented a photo array to Nebyou Habtemarim, who was one of the victims of the Raymok Bar

---

[6] Sergeant Harris described a CAD report as "a computer-generated report by dispatch" that relates what the call is about, the units responding, a date and time, a brief narrative of the call, and identification numbers. (Tr. 16-17).

robbery. (Tr. 54-55). Detective Evans created a photo array by searching the jail management system for individuals the same race, sex, height, weight, and age as Defendant. (Tr. 47). After selecting five photographs that matched the target picture, Detective Evans placed each photograph on a single sheet of paper in separate folders. (Tr. 48; Gov't Exs. 1A-1F). Because his office was short staffed that day, Detective Evans decided to do the lineup himself and record it. (Tr. 54; Gov't Ex. 1). When Mr. Habtemarim arrived, Detective Evans brought him into the interview room and read him the Photographic Line-Up Admonition form, which states that the person who committed the crime may not be in the photographs provided and directs the witness not to be distracted by background scenery or scars, marks, or tattoos, as they can be easily modified. (Tr. 56-57; Govt's Ex. 9). It took Mr. Habtemarim approximately one or two minutes to identify Defendant's photograph in the photo array, and he stated he was "very sure" he identified the right person. (Tr. 58; Gov't Ex. 9). Detective Evans admitted during the evidentiary hearing that the Defendant's photograph was the only one in the array with a slightly orange tint and a medium brown complexion. (Tr. 73).

Officer Daniel Dennerline used the same photographs when he interviewed witnesses of an armed robbery at a Waffle House on Panola Rd. (Tr. 76; Gov't Exs. 5A-5F). On November 18, 2016, Officer Dennerline met with four witnesses at the Waffle House around 10:40 p.m. (Tr. 90, 95). Officer Burton was also present, although he was working at the Waffle House at the time. (Tr. 90-91, 99-100). Officer Dennerline met with each witness individually and instructed them not to communicate

6

with each other between speaking to him. (Tr. 96). The interviews were audio recorded. (Tr. 93; Gov't Ex. 15). Officer Dennerline read the Photographic Line-Up Admonition form to each witness and provided a folder containing the photographs. (Tr. 90). Three of the witnesses – Cynthia Lindsay, Janell Reeves, and Patricia Rener – identified Defendant as the person who committed the crime. (Tr. 89; Gov't Exs. 10-12). After making the identification, Cynthia Lindsay stated, "I am certain that this person is the one." (Tr. 93; Gov't Ex. 10). Janelle Reeves wrote, "I am positive this him." (Tr. 93; Gov't Ex. 11). Patricia Rener stated the person she identified is "the person who committed the crime." (Tr. 92-93; Gov't Ex. 12).

## LEGAL ANALYSIS

### I.   EVIDENCE GATHERED FROM THE APARTMENT

Defendant seeks to suppress the shoes, gray top, and jeans collected by Sergeant Harris. In support, Defendant argues Sergeant Harris seized the evidence from his friend's apartment without a warrant in violation of the Fourth Amendment. (Def's Br. 13-17, Doc. 44). The Government contends that Defendant does not have standing to challenge the seizure of those items because Defendant had no reasonable expectation of privacy in his friend's apartment. (Gov't Br. 11-13, Doc. 46). Even if Defendant has standing, the Government argues it was permitted to seize the articles of clothing under the plain view exception or as a search incident to arrest. (Id. 14-28). Defendant

responds that he had a privacy interest in the clothing laying next to his person.[7] (Def.'s Reply Br. 4-6, Doc. 47, Def.'s Perf. Mot. 4-7, Doc. 25; Def.'s Reply 9-13, Doc. 25). Defendant asserts that the plain view exception does not apply because the items were not clearly "contraband;" no exigent circumstances existed to justify a warrantless seizure; and if Sergeant Harris seized them during a search incident to arrest, either the arrest was not supported by probable cause or the search exceeded the permissible scope. (Def.'s Br. 8-17; Def.'s Reply 6-10, 16-18). The Government contends that the items were clearly evidence of a crime, exigent circumstances were not required to seize them, and Sergeant Harris had probable cause to arrest Defendant at the apartment, although Defendant was not actually arrested until after he arrived at the hospital. (Gov't Br. 10, 14-28).

### A.  Defendant Has Standing to Challenge the Seizure of His Clothing

The Fourth Amendment of the Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. The Fourth Amendment "protects two types of expectations, one involving searches, the other seizures. A search occurs when an expectation of privacy that society is prepared to consider reasonable is infringed. A seizure of property occurs where there is some meaningful interference with an individual's possessory interests in that property." Soldal v. Cook Cty., 506 U.S. 56, 63

---

[7] Defendant abandoned the argument that he also had a privacy interest in his family friend's apartment. (Def.'s Reply 9, Doc. 25; Def.'s Reply Br. 5, Doc. 47).

(1992) (citing <u>United States v. Jacobsen</u>, 466 U.S. 109, 113 (1984)).  Property is seized within the meaning of the Fourth Amendment when an officer exercises dominion or control over the property or meaningfully interferes with defendant's possessory rights. <u>United States v. Batson</u>, 2018 WL 4339629, at *1 (11th Cir. Sept. 11, 2018) (citing <u>Soldal</u>, 506 U.S. at 61 and <u>Jacobsen</u>, 466 U.S. at 118-22).

As a threshold matter, for Defendant to have standing to challenge Sergeant Harris's seizure of his clothing under the Fourth Amendment, the seizure must have interfered with Defendant's possessory interest in property.  <u>United States v. Padilla</u>, 508 U.S. 77, 81 (1993) (holding that a defendant may assert his or her rights under the Fourth Amendment based on either reasonable expectations of privacy in an area searched or an ownership interest in the items seized); <u>Rakas</u> 439 U.S. at 134 ("Fourth Amendment rights are personal rights which . . . may not be vicariously asserted."); <u>Lenz v. Winburn</u>, 51 F.3d 1540 n.10 (11th Cir. 1995) ("It is true that a possessory interest is all that is needed for the Fourth Amendment's reasonableness requirement to apply to a seizure.").  The ability to challenge the seizure of property does not require a corresponding invasion of privacy. <u>Soldal</u>, 506 U.S. at 68 ("[S]eizures of property are subject to Fourth Amendment scrutiny even though no search within the meaning of the Amendment has taken place."); <u>see</u> <u>United States v. Place</u>, 462 U.S. 696, 707 (1983) (finding a defendant had standing to challenge a seizure of a suitcase where the suitcase was not searched within the meaning of the Fourth Amendment); <u>United States v. Delgado</u>, 903 F.2d 1495, 1502 (1990) (holding that the defendant had standing to

9

challenge seizure of personal belongings even though he had no privacy interest in the warehouse where they were seized).   Thus, even though Defendant abandoned the argument that he had a reasonable expectation of privacy in his family friend's apartment, his lack of standing to challenge the search does not foreclose his ability to challenge the seizure of his clothing and shoes.  (Def's Reply Br. 5-6).

While a possessory interest imparts standing to challenge a seizure, whether a defendant indeed has a possessory interest in a seized object is a fact-intensive determination.  It is not enough to merely claim an ownership interest in the object.  In United States v. Bushay, the court found that the defendant did not have standing to challenge the seizure of a gun based solely on his claim of ownership when the gun was located in a hotel room where the defendant had no expectation of privacy, the gun was not registered to him, and he was not even present when the gun was seized.  859 F. Supp. 2d 1335, 1350-53 (N.D. Ga. 2012).  In addition, although though a defendant may own an object, abandoning it relinquishes the possessory interest for Fourth Amendment purposes.  E.g. Cal. v. Hodari, 499 U.S. 621, 629 (1992) (permitting officers to seize contraband discarded during flight); United States v. Walker, 199 F. App'x 884, 886 (11th Cir. 2006) (upholding district court's determination that a defendant abandoned his bags by leaving them in someone else's apartment and fleeing from the apartment parking lot); United States v. Edenilson-Reyes, No. 1:09-CR-00361-RWS-AJB, 2010 WL 5620439, at *16 (N.D. Ga. Oct. 26, 2010) (finding abandonment in a defendant's affirmative statement disclaiming ownership).

In the case at hand, Defendant has demonstrated a possessory interest in his clothes and shoes sufficient to confer standing to challenge their seizure. Although someone removed Defendant's top and shoes from his person before Sergeant Harris arrived at the apartment, they were lying next to him on the floor. (Tr. 32; Gov't Exs. 2-3). There was no indication Defendant intended to abandon the items; they were located right to him until Sergeant Harris seized them. This case is analogous to United States v. Delgado, in which DEA agents searched the defendant's workplace, a warehouse, and seized his shirt and the papers inside his shirt. 903 F.2d at 1501. The agents found the defendant hiding shirtless behind a couch during the warehouse search, while his shirt was located nearby on a forklift. Id. The Eleventh Circuit held that although the defendant did not have a reasonable expectation of privacy in the warehouse, he had standing to challenge the seizure of the shirt and papers because they were his personal possessions. Id. at 1502. See also Jones v. State, 648 So.2d 669, 674-75 (Fl. 1994) (finding that defendant had standing to challenge the seizure of clothing from his hospital room). Therefore, Court finds that Defendant has standing to challenge the seizure of his personal belongings – his gray top, jeans, and shoes – from the Cedar Creek apartment.

### B.   Defendant's Clothing Was Properly Seized Under the Plain View Doctrine

The plain view doctrine permits police officers, under certain circumstances, to seize evidence in plain view without a warrant." Coolidge v. New Hampshire, 403 U.S. 443, 465 (1971) (plurality opinion). First, the officer must have lawful access to the

11

area where the evidence is located. Horton v. California, 496 U.S. 128, 136 (1990). Then, evidence must be in plain view, and its incriminating character must be "immediately apparent." Id. at 136-37 (citing Coolidge, 403 U.S. at 466). The Supreme Court has interpreted "immediately apparent" to require probable cause, meaning that the facts available to the officer would cause a reasonable person to believe that the item in question is "contraband, stolen property, or evidence of a crime." Texas v. Brown, 460 U.S. 730, 741-42 (1983) (plurality opinion); see United States v. Folk, 754 F.3d 905, 912 (11th Cir. 2014).

Defendant seeks to add an additional requirement: that a "plain view" seizure violates the Fourth Amendment in the absence of "exigent circumstances." (Def.'s Br. 15-16). Defendant relies solely on the following statement from Justice Stewart, writing for the plurality in Coolidge: "[P]lain view alone is never enough to justify the warrantless seizure of evidence. This is simply a corollary of the familiar principal discussed above, that no amount of probable cause can justify a warrantless search or seizure absent exigent circumstances." 403 U.S. at 468.

Even if Justice Stewart intended to require exigent circumstances for all plain view seizures in Coolidge, subsequent Supreme Court jurisprudence implicitly rejected such a requirement. See e.g. Brown, 460 U.S. 730, 736-37 (1983) (plurality opinion) (acknowledging that Coolidge is not binding precedent, and then excluding "exigent circumstances" from its summary of the plain view exception as articulated in Coolidge); Horton, 496 U.S. at 136-37 (excluding "exigent circumstances" from its

12

summary of the plain view exception).

Nor do the Court's holdings that address the plain view exception suggest such a limitation. For example, in <u>Washington v. Chrisman</u>, the Court approved the seizure of a marijuana pipe and marijuana under the plain view exception. 455 U.S. 1, 5-9 (1982). After arresting a student for underage drinking on the street, the officer legally accompanied the student to his room to obtain his identification. <u>Id.</u> at 7. Another student was present in the dorm room. <u>Id.</u> at 3. The marijuana and pipe came into plain view, and the officer seized them. <u>Id.</u> at 4, 8-9. Approving the seizure, the Court expressly rejected the argument that "exigent circumstances" were required for the officer to be present to view the marijuana and pipe because the officer lawfully followed the student to the dorm room following the arrest where the marijuana and pipe came into plain view. <u>Id.</u> at 6-9. After seeing the marijuana and pipe, the officer placed both boys under arrest, and there was no indication that anyone else was present in the room to get rid of the evidence. <u>Id.</u> at 3-4. The Court did not require exigent circumstances either to search the room or seize the contraband. To the extent <u>Coolidge</u> required exigent circumstances, such a requirement is no longer part of the plain view doctrine. In summary, under the plain view doctrine, "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." <u>Minnesota v. Dickerson</u>, 508 U.S. 366, 375 (1993).

Sergeant Harris's presence in the apartment of Defendant's family friend was

13

lawful. Sergeant Harris was responding to an emergency call requesting assistance, and Defendant's family friend, who lived in the apartment, opened the door and permitted Sergeant Harris to access the area to assist Defendant. (Tr. 9). Although the apartment is a private residence, Office Harris was there for the legitimate purpose of rendering aid in response to a 911 call. "Numerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid . . . [a]nd the police may seize any evidence that is in plain view during the course of their legitimate emergency activities." Mincey v. Arizona, 437 U.S. 2408, 2413 (1978) (finding the warrantless search unjustified, however, because all the house's inhabitants had been removed when the search began and no exigent circumstances justified the four-day search); see United States v. Holloway, 290 F.3d 1331, 1338 (11th Cir. 2002) (approving the warrantless search of a property without the resident's consent where there was probable cause to believe someone inside the residence might have been shot); United States v. Dabrezil, 603 F. App'x 756, 759 (11th Cir. 2015) (approving a warrantless entry into an apartment when a resident called 911 to report injuries and request rescue). The record does not suggest and Defendant does not argue that Sergeant Harris went further into the apartment than would be reasonable to render aid: the clothes and shoes were beside Defendant near the entrance to the apartment, and Sergeant Harris testified that he stayed by Defendant because of his injury. (Tr. 45; Gov't Exs. 2-3). Therefore, once the apartment's occupant opened the door and

14

permitted Sergeant Harris to respond to the 911 call and assist Defendant, Sergeant Harris was lawfully in a position to view the clothing and shoes and had lawful access to them.

Defendant focuses the bulk of his argument on whether the incriminating character of gray hoodie, shoes, and bloody pants was readily apparent. (Def.'s Br. 14-16; Def.'s Reply Br. 6-9). Sergeant Harris had probable cause to believe the clothing was evidence of a crime because Defendant was lying on the ground with a gunshot wound in his leg. Sergeant Harris credibly testified that he initially perceived Defendant to be a victim, but later believed Defendant could be either a victim or a suspect after he observed Defendant's behavior and received more information about the nearby Raymok Bar shooting. (Tr. 13, 15-16, 18).

Clothing that matches the description of the suspect's attire can properly be seized under the plain view doctrine as evidence of a crime. In Maryland v. Buie, the Supreme Court held that an officer properly seized a red track suit during a lawful protective sweep following an in-home arrest because the suspect was described as committing the crime while wearing a red track suit. 494 U.S. 325, 328, 330 (1990). The running suit "was in plain view and . . . the officer had probable cause to believe it was evidence of a crime." Id. at 330. Bloody clothing can also be seized as evidence of a crime. In United States v. Howard, No. 1:10-CR-121-ODE-GGB, 2011 WL 1457179, at *2 (Feb. 9, 2011), the Court approved the seizure of bloody clothing from the floor of a hospital trauma room after the suspect was shot by a security officer and the security officer

15

recognized his voice in the hospital.  (Id.).  "[T]he pieces of bloody clothing served as a clear evidentiary link tying Defendant to the attempted robbery." Id. at 4.  Further, it is permissible under the plain view doctrine for officers to seize a victim's clothing to preserve evidence of a crime.  See United States v. Davis, 690 F.3d 226, 233-238 (4th Cir. 2012).  The Fourth Circuit found that a bag of clothing an officer seized from a victim's hospital room contained evidence of a crime, namely blood and a bullet hole. Id. at 235-237.  Similarly, Sergeant Harris's perception of Defendant as a victim of gun violence gave rise to probable cause that the clothing Defendant was wearing when he was shot could contain trace evidence, blood, and a bullet hole.  Defendant's wound indicated that a crime was committed, and there was probable cause to believe the clothing he was wearing could be evidence of a crime whether he was the victim or a suspect.  Therefore, Sergeant Harris's seizure of his clothing did not run afoul of the Fourth Amendment, and Defendant's Motion to Suppress the clothing Sergeant Harris collected in the apartment should be denied.

## II.    EVIDENCE FOUND IN THE CAR AT RAYMOK BAR

Defendant challenges the warrantless search of the Acura left at Raymok Bar. (Def.'s Perf. Mot. 9-13).  To have standing to challenge a search, a defendant must have a subjective expectation of privacy in the place searched that "society is prepared to recognize as reasonable." Rakas, 439 U.S. at 143 & n.12.  The Eleventh Circuit has held that a defendant does not have a reasonable expectation of privacy in a stolen vehicle. United States v. Knight, 336 F.App'x 900, 904 (11th Cir. 2009) ("[Defendant]

16

did not have a reasonable expectation of privacy in the stolen car."); see United States v. North, No.1:16-cr-309-WSD2017, WL 3821854, at *4 (N.D. Ga. Sept. 1, 2017) ("Courts have consistently held that a defendant does not have a reasonable expectation of privacy in a vehicle the defendant has stolen.").

Defendant has failed to meet his burden of demonstrating a reasonable privacy interest in the car, and has therefore failed to establish standing to challenge the search of the car. See United States v. Cooper, 133 F.3d 1394, 1398 (11th Cir. 1998) ("The individual challenging the search bears the burdens of proof and persuasion."); United States v. Bushay, 859 F.Supp.2d 1335, 1349 (N.D. Ga. 2012) ("[D]efendant ultimately carries the burden of proving his standing."). Defendant only states in a motion that he obtained the car in "what he assumed to be, a legitimate manner," but does not provide any details or evidence indicating legal ownership or possession. (Def's Perf. Mot. 10, Doc. 23). Defendant cannot rely on such a vague statement to meet his burden of demonstrating a reasonable expectation of privacy in the car. Cf. United States v. Degaule, 797 F.Supp.2d 1332, 1362 (N.D. Ga. 2011) (denying motion to suppress data from cell phones where the phones were not in the defendant's name and he had not shown possession, ownership, or control). In United States v. Moulton, the Court found that a defendant did not have a reasonable expectation of privacy in a stolen car where the car was registered to someone else and the defendant "did not present any evidence that he gained possession of the vehicle from someone with authority to grant it." United States v. Moulton, No. 1:10-CR-120-MHS-RGV, 2010 WL 6084115, at *9 (N.D.

Ga. Nov. 22, 2010), adopted by 2011 WL 902639 (Mar. 14, 2011) (quoting United States v. Eckhart, 568 F.3d 1263, 1274 (10th Cir. 2009)). Here, Defendant similarly did not present any evidence of legal ownership or possession of the car found in the Raymok Bar parking lot. Accordingly, Defendant's Motion to Suppress evidence obtained from the car found in the Raymok Bar parking lot should be denied.

### III.    WITNESS IDENTIFICATIONS

Defendant argues that the witness identifications are unreliable because the photo array was unduly suggestive and the identifications lack reliability. (Def.'s Br. 17-23, Doc. 44). Defendant asserts the photo array was unduly suggestive for the following reasons: (1) Defendant's photo is the only one with a red tone, whereas the others have a yellow-orange or blue-purple tone; (2) Defendant's photo is the only one depicting a man with a medium brown complexion, as the others have light brown or dark brown complexions; (3) Defendant was the only one showing teeth in his photo; and (4) Defendant's photo is the only one where the three dots on the cheek do not appear to be digitally added. (Id. 19-21). Defendant then argues the witness identifications are unreliable for the following reasons: (1) the robberies took place within a short period of time when it was dark outside; (2) the witnesses would have been focused on self-preservation because of the weapon; (3) the description of the robber as a black male with a gray shirt is very generic; (4) one out of the four witnesses at Waffle House did not make an identification; and (5) several days passed between the crime and the witness identification. (Id. at 22-23).

18

The Government responds that the various hues of the photos did not render the photo array unduly suggestive, nor did the variation in complexions or the fact that Defendant was the only one showing teeth.  (Gov't Br. 32-33, Doc. 46).   The Government points out that the Admonition form specifically directs witnesses not to be distracted by scars or marks that appear in the photographs.  (Id. at 35).  Further, the Government contends that the identifications are reliable because only a short time passed between the robberies and the lineups, the robberies took place indoors, the witnesses gave a fair amount of detail in their descriptions of Defendant, and the witnesses indicated a high level of certainty in their identifications.  (Id. at 36-37).

The Supreme Court has established a two-part test to determine the constitutionality of witness identification procedures.  The first inquiry is whether the identification procedures were unduly suggestive.  Manson v. Braithwaite, 432 U.S. 98, 129 (1977).  If so, the next question is whether, under the totality of the circumstances, the identification was nevertheless reliable.  Id. at 113; Neil v. Biggers, 409 U.S. 188, 199 (1972).  "Reliability is the linchpin in determining the admissibility of identification testimony," and factors to be considered include: opportunity to view the criminal, degree of attention, accuracy of any prior description, certainty of identification, and time lapsed between crime and confrontation.  Biggers, 409 U.S. at 199-200; U.S. v. Beale, 921 F.2d 1412, 1433 (11th Cir. 1991).  In the typical case, a defendant is protected from the effects of a questionable identification by arguing to the jury that the identification should be discounted or disregarded; identification evidence is only

19

excluded when it is so unfair that to admit it would violate fundamental conceptions of justice. Perry v. New Hampshire, 565 U.S. 228, 237 (2012). When a witness identifies the defendant in a photo array, the witness identification should only be suppressed where "the photographic identification procedure was so unnecessarily suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Id. (quoting Simmons v. United States, 390 U.S. 377, 384-85 (1968).

As Detective Evans testified, he selected the other lineup photographs because they showed individuals who shared Defendant's race and sex, and were of similar height, weight, and age to Defendant. (Tr. 47). Neither the variations in skin tone nor background hue among the six photographs render the photo array unduly suggestive. See United States v. Knight, 382 F. App'x 905, 907 (11th Cir. 2010) (although defendant waived the issue, opining that a photo array where defendant was of a lighter complexion than four of the six photographs and the background lighting in his photograph was slightly different from some of the others was not unduly suggestive); United States v. Whitney, 787 F.2d 457, 459 (8th Cir. 1986) (finding the photo array not unnecessarily suggestive even though defendant alleged he was the only black man with a light complexion and his photograph was larger than the others).

Defendant also argues the lineup is unduly suggestive because he has a tattoo of three dots beside his right eye and his is the only photo where teeth are visible. (Def.'s Br. 19-21). Although the officer added three dots to the other photographs to mimic the tattoo, Defendant believes his photograph stands out as the one where the tattoo appears

realistic. (Id. at 20-21). The Eleventh Circuit has held that "[A] lineup is not unduly suggestive merely because the defendant's photograph can be distinguished from the others." United States v. Smith, 148 F. App'x 867, 874 (11th Cir. 2005). In Smith, the distinguishing features were more pronounced than in the case at hand. Id. The defendant's photo was on a different background than the other five pictures, and the defendant was one of only two photographs where the person was wearing a blue shirt, which the suspect was believed to have worn. Id. The Eleventh Circuit found that the other lineup photos had "substantial similarity in facial features, complexion, facial hair, and general body type and appearance," and held that the lineup was not unduly suggestive. Id. at 874-75. Similarly, in Cikora v. Dugger, the defendant's photo was the only one with height markings in the background, and the defendant had different facial hair than the people in the five other photographs. 840 F.2d 893, 894 (11th Cir. 1988). The Eleventh Circuit affirmed the district court's finding that the photo array was not impermissibly suggestive under the applicable clearly erroneous standard. Id. at 897. The Eleventh Circuit has also held that a photo array where the defendant was the only one wearing glasses was not impermissibly suggestive. United States v. Ricks, 817 F.2d 692, 697 (11th Cir. 1987) (although disapproving of the practice).

None of the cases upon which Defendant relies support the suppression of the witnesses identifications based on the photo array in this case. In Williams v. Weldon, the Eleventh Circuit approved a lineup in which defendant was the only black man in any of the photos. 826 F.2d 1018, 1021 (11th Cir. 1987). The court held that being of

21

a different race or ethnic group does not necessarily make a lineup impermissibly suggestive, especially where the other photos featured individuals with "roughly the same characteristics and features." Id. Far from supporting Defendant's argument, Williams holds that the photos selected for the array do not need to be precise matches, but avoid being unduly suggestive by having "roughly the same characteristics and features." Id.

Taking all of Defendant's allegations into consideration, and reviewing the photo array, the Court finds that the photo array was not unduly suggestive.  There are inevitable differences between the photographs, as they are photographs of different people taken at different times.  The variations alleged here – skin tone, background, teeth showing, and realistic facial markings – do not render the photo array unduly suggestive.  The appropriate remedy in this case, as in most cases, is for Defendant to make his arguments in favor of discounting the identifications to the jury.

## CONCLUSION

Based on the foregoing reasons, the Court **RECOMMENDS** that Defendant's Motion to Suppress Evidence, Motion to Suppress In-Court Identification and Perfected Motion to Suppress Evidence be **DENIED**.  (Docs. 16, 18, 23).  As there are no further motions pending, the undersigned certifies this case ready for trial.  The Clerk is directed to terminate the reference to the undersigned.

22

AO 72A
(Rev.8/82)

**SO REPORTED AND RECOMMENDED**, this 25 day of October, 2018.

LINDA T. WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/82)